## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, John A. Bartolomucci, being sworn, state:

### Introduction and Agent Background

1.   I am a full-time Detective with the City of Watertown, Massachusetts Police Department and am currently assigned to the Federal Bureau of Investigation ("FBI") and Boston Homeland Security Task Force ("HSTF") Strike Force.  I have been a Watertown Police Officer since 2003 and have been assigned to the Detective Division since 2008 as a narcotics and general investigator.  Since 2012, I have been assigned as a Task Force Officer ("TFO"), defined as a sworn Special Federal Officer with the FBI, and a sworn Special Deputy United States Marshal with the United States Marshals Service.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.   My primary duties include the investigation of organized narcotics traffickers, narcotics distribution, money-laundering offenses, and other federal and state crimes.  I have written or participated in numerous arrests for both state and federal law violations, seizures of large quantities of controlled substances and currency, physical and electronic surveillance, the execution of search warrants, and debriefing of informants.  I have participated in at least thirty investigations that involved the use of court-ordered interception of wire and/or electronic communications.  I have testified in state and federal courts. I have participated in the execution of over 300 state and federal search warrants for narcotics offenses.  I have been the affiant for over 100 state and/or federal search warrants. These search warrants have led to the seizure of large amounts of drug evidence and convictions in state and federal court.

3.    In addition to my Massachusetts Criminal Justice Training Council Academy training and annual in-service training, I have received over 400 hours of specialized narcotics training to include undercover survival, and the identification, distribution, packaging, trafficking, and usage of narcotics.  I have also received specialized investigative training from the Massachusetts Criminal Justice Training Council ("MCJTC"), the Massachusetts State Police ("MSP"), the FBI, the Drug Enforcement Administration ("DEA"), the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the University of Tennessee National Forensic Academy, and the Middlesex District Attorney's Office regarding criminal and narcotic investigations.  I am also a locally certified Undercover Officer by the FBI and the Boston Police Department and have worked in covert capacities.  I have a Bachelor's Degree in Criminal Justice from Northeastern University in Boston, Massachusetts.

4.    In the course of my official duties as a police officer, detective, and TFO, I have interviewed over 300 defendants, informants, and suspects who were consumers and distributors of controlled substances and who laundered drug proceeds.  I am familiar with the street language of illegal narcotic consumers and distributors and money launderers.  I have worked with and have been trained by officers experienced in the investigations of illegal narcotics trafficking, using various methods, including but not limited to the following: undercover assignments, both physical and electronic surveillance, and the establishment of reliable informants.  Based on my training and experience, I have observed numerous types of controlled substances, and I am familiar with the packaging, pricing structure, distribution methods, and street jargon associated with their sale and use. I have also encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.

5.    In conjunction with other federal law-enforcement agencies, I have participated in over 500 narcotics investigations to include investigations of large scale national and international drug-trafficking organizations, including organizations actively involved in the laundering of drug proceeds. These investigations have included the introduction of undercover officers and confidential informants into these groups, and the implementation of electronic surveillance, including but not limited to, wiretapping and global positioning systems ("GPS").

6.    Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers and money launderers operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers and money launderers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking.  I am familiar with the manner in which drug traffickers and money launderers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

7.    Based on my training and experience, I understand that illegal drug trafficking and money laundering often involves the local, interstate, and international movement of drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

**Purpose of the Affidavit**

8.    I submit this affidavit in support of an application for a criminal complaint charging Jan PAULINO ("PAULINO") with conspiracy to launder money, in violation of Title 18, United

States Code, Section 1956(h) (the "Charged Offense"). Based on the facts set forth in this affidavit, there is probable cause to believe that the PAULINO has committed the Charged Offense.

9.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

## Probable Cause

### *Investigation Background*

10.    In March 2025, investigators spoke with a cooperating witness (hereinafter, "CW-1"), who developed and provided information about a group of individuals operating in Boston and New York City interested in laundering suspected illegal proceeds through financial entities and cryptocurrency. CW-1 is willing to testify if needed.[1] After conducting several operations with CW-1, during which investigators identified several targets involved in suspected money laundering and drug activities, investigators were able to successfully introduce law enforcement agents acting in undercover capacities as associates of CW-1 to these targets. These undercover agents were introduced as being capable of accepting bulk cash and converting it into various forms of cryptocurrency. Since these initial introductions, undercover agents have picked up bulk cash believed to be drug proceeds from various money launderers and drug traffickers in multiple

---

[1] CW-1 has been cooperating with the government since 2012. CW-1 provides information to law enforcement for monetary compensation. CW-1 has a criminal record that includes an arrest for credit card fraud. CW-1 has provided information that has led to identification of narcotics traffickers, arrests of those traffickers, and large seizures of narcotics. Information provided by CW-1 has been corroborated to the extent possible and is believed to be reliable.

locations around the United States and transmitted cryptocurrency to wallets identified by the traffickers.

11. As described below, CW-1 informed investigators that CO-CONSPIRATOR 1[2] had access to large quantities of bulk cash that he wanted to be laundered through cryptocurrency in the Boston area. CO-CONSPIRATOR 1 spoke with CW-1 about CW-1's ability to launder the money through cryptocurrency transfers and inquired what percentage fee CW-1 would charge for his services. At the direction of investigators CW-1 then introduced an investigator acting in an undercover capacity ("UC-1") to communicate with CO-CONSPIRATOR 1 to arrange multiple pickups of bulk cash believed to be illegal proceeds from local couriers employed by CO-CONSPIRATOR 1.

*CO-CONSPIRATOR 1 and PAULINO Facilitated the Delivery of Bulk Cash, Suspected Illegal Proceeds, to a Cooperating Witness in Exchange for Cryptocurrency.*

12. CW-1 had provided CO-CONSPIRATOR 1's phone number to UC-1 and had explained to CO-CONSPIRATOR 1 that UC-1 would be contacting him. On March 6, 2025, UC-1 and CO-CONSPIRATOR 1, using phone number 904-449-0034 (the "0034 Phone"), began exchanging text messages. These text messages were in Spanish and preserved. A Spanish-speaking investigator has reviewed the messages and provided preliminary translations. In lightly coded language, CO-CONSPIRATOR 1 explained to UC-1 that CO-CONSPIRATOR 1 was interested in laundering bulk cash proceeds through cryptocurrency purchases. CO-CONSPIRATOR 1 and UC-1 then had a recorded phone conversation. During this phone call,

---

[2] I know the identity of CO-CONSPIRATOR 1, but am not including his name in this affidavit because this investigation is ongoing.

CO-CONSPIRATOR 1 and UC-1 discussed they type of cryptocurrency CO-CONSPIRATOR 1 wanted to purchase. Based on experience and training, I know that there are multiple types of cryptocurrency, including Bitcoin, Tether, and TRON, among others. Additionally, CO-CONSPIRATOR 1 stated he was willing to pay 2% to 2.5% per transaction. In my experience and training, I know that it is common for a money launderer (which UC-1 was purporting to be) to charge a commission for each monetary transaction, usually a percentage of the total amount of money picked up and transferred. UC-1 and CO-CONSPIRATOR 1 agreed that UC-1 would purchase TRC or TRON cryptocurrency and discussed the logistics of the transaction. CO-CONSPIRATOR 1 explained that he would have the money dropped off to UC-1 in Boston. UC-1 and CO-CONSPIRATOR 1 agreed that UC-1 would purchase cryptocurrency and transfer approximately 60% to 80% of the cryptocurrency at delivery. UC-1 would transfer the remaining 20% to 40% once UC-1 confirmed the total amount of bulk currency picked up through a money counter.

13. CO-CONSPIRATOR 1 inquired if all transactions needed to occur in Massachusetts and was interested if they could conduct money pickups in different locations. UC-1 explained that UC-1 needed to establish a trusting relationship with CO-CONSPIRATOR 1 before they moved locations. CO-CONSPIRATOR 1 explained that he would be interested in conducting money pickups three to four times per week in the Boston area. However, UC-1 and CO-CONSPIRATOR 1 agreed to conduct pickups approximately once per week to minimize the risk of getting caught.

*On March 13, 2025, PAULINO Coordinated the*
*Dropoff of $368,260, Believed to be Illegal Proceeds, Brokered by CO-CONSPIRATOR 1.*

14.    On March 12, 2025, UC-1 received a phone call from phone number 347-680-1277 (the "1277 Phone"). This call was recorded. The user of the 1277 Phone identified himself as "PAULINO" and stated he was calling on behalf of "Paul." Later in the phone call, PAULINO explained that "Paul" was actually CO-CONSPIRATOR 1, and that PAULINO was CO-CONSPIRATOR 1's cousin. Based on PAULINO's own statements, his description of CO-CONSPIRATOR 1 as his cousin, and the information described below, investigators determined that PAULINO was the user of the 1277 Phone.[3]  UC-1 and PAULINO agreed to meet so that PAULINO could provide the money, previously discussed with CO-CONSPIRATOR 1, to UC-1. UC-1 understood that PAULINO would be delivering the money on behalf of CO-CONSPIRATOR 1. UC-1 and PAULINO agreed to conduct the money pick up the following day, March 13, 2025.

15.    On March 13, 2025, investigators planned to have another cooperating witness ("CW-2")[4] actually conduct the money pickup. Prior to the meeting with PAULINO, investigators met with CW-2 at a predetermined location. Investigators searched CW-2 and CW-2's vehicle for

---

[3] Described below, PAULINO frequently used rental cars to deliver the money to the CWs. Investigators obtained rental information for those vehicles. PAULINO rented the vehicles under his name, using his Massachusetts driver's license, which listed 132 Ashcroft Street, Dedham, Massachusetts as his address.

[4] CW-2 has a criminal history involving convictions for armed robbery and home invasion, among others. CW-2 served a significant prison sentence for state court convictions. Investigators identified CW-2 as a drug trafficker as part of a separate drug investigation. After CW-2 sold drugs to a government informant, investigators approached CW-2 and CW-2 agreed to cooperate with investigators in the hopes that criminal charges could be avoided or reduced. CW-2 is now also cooperating for monetary compensation. CW-2 has provided information that has been corroborated and that has led to the identification of additional targets of other investigations and seizures of drugs. Information provided by CW-2 is believed to be reliable.

contraband and currency with negative results and equipped CW-2 with an audio/video recording device. Investigators then surveilled CW-2 as he drove to the meeting location with PAULINO, a Target store parking lot in Watertown, Massachusetts. CW-2 arrived at the parking lot at approximately 1:49 p.m. Investigators maintained surveillance of CW-2.

16. At approximately 1:45 p.m., PAULINO arrived at the parking lot. PAULINO parked his vehicle, walked up to CW-2's vehicle, and entered the front passenger seat of CW-2's vehicle. Once inside CW-2's vehicle, PAULINO handed CW-2 a large FedEx box containing bulk cash. During the meeting, CW-2 had an active recorded Facetime call with UC-1. The purpose of this was so UC-1, the purported boss of CW-2, could verify the transaction. After PAULINO provided the money to CW-2, PAULINO got back in his vehicle and departed the area.

17. Investigators surveilled CW-2 as he drove back to the predetermined meeting location. At the meeting location, CW-2 turned over the FedEx box containing the money. The money was banded in stacks and wrapped in plastic wraps in bundles of $10,000 each. Investigators searched CW-2 for contraband and currency with negative results. Investigators conducted an official count of the money and determined it to be $368,260 in bulk U.S. currency. A second investigator acting in an undercover capacity ("UC-2") then ultimately transmitted $368,260, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO. Based on my experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that CO-CONSPIRATOR 1 and PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

*On March 24, 2025, PAULINO Coordinated the*
*Dropoff of $439,020, Believed to be Illegal Proceeds.*

18. On March 23, 2025, UC-1 received a call from the 0034 Phone. This call is recorded. The caller identified himself as "Juan," ("JUAN") and UC-1 believed it was a different person than UC-1 had spoken to over the 0034 Phone on prior occasions, i.e. not CO-CONSPIRATOR 1. In lightly coded language, JUAN stated that he was the owner of the money that UC-1 picked up and converted to TRON. JUAN further stated that he was happy with UC-1's business. JUAN stated that he wanted to conduct another money pick up the following day, March 24, 2025, in the amount of $734,000. JUAN explained that "Jan" would be bringing the cash to the meeting. UC-1 believed that "Jan" was a reference to Jan PAULINO.

19. Prior to March 24, 2025, through rental vehicle records, driver's license information, and physical surveillance, investigators had identified PAULINO's likely residence as 132 Ashcroft Street, Dedham, Massachusetts ("132 Ashcroft"). On March 24, 2025, investigators set up surveillance around 132 Ashcroft. At approximately 10:03 a.m., investigators observed PAULINO circling the neighborhood around 132 Ashcroft in a BMW rental vehicle. At 10:20 a.m., PAULINO parked in the driveway of 132 Ashcroft. At 12:15 p.m., PAULINO sent a text message, using the 1277 Phone, to UC-1 explaining that PAULINO was 40 minutes away from the meeting location. At 12:22 p.m., investigators observed PAULINO pull out of the driveway in the BMW rental. Investigators followed PAULINO from 132 Ashcroft to the meeting location in Watertown, Massachusetts. PAULINO did not stop anywhere along the way.

20. Prior to the arranged meeting with PAULINO, investigators planned to have another cooperating witness ("CW-3")[3] meet with PAULINO to pick up the money. Prior to meeting with PAULINO, investigators met with CW-3 at a predetermined location. Investigators searched CW-3 and his vehicle for contraband and currency with negative results and equipped CW-3 with an audio/video recording device. Investigators then surveilled CW-3 to the meeting location with PAULINO.

21. At approximately 1:04 p.m., investigators observed PAULINO arrive in the area of the meeting location. PAULINO circled the area for several minutes. Based on experience and training, investigators believe that he was ensuring there was no law enforcement presence in the area. PAULINO, using the 1277 Phone, then called UC-1 in an attempt to try to locate CW-3 to conduct the money drop-off. At approximately 1:18 p.m., PAULINO was able to locate CW-3 in the parking lot.

22. PAULINO retrieved a black suitcase from the trunk of his rental vehicle and placed it on the rear seat of CW-3's vehicle. CW-3 then contacted UC-1 and asked UC-1 to send the cryptocurrency. PAULINO remained in CW-3's vehicle while he waited for the initial payment of cryptocurrency to transfer to the recipient wallet. While waiting, PAULINO was speaking on his cell phone to the ultimate recipient of the cryptocurrency, who PAULINO referred to as "Coca Cola." PAULINO also spoke to someone in the Dominican Republic to try to sell that person a

---

[3] CW-3 has a criminal history that includes convictions for drug distribution. CW-3 also lived in the United States for several years under an assumed identity and was arrested for identity theft in 2019. The charge was later dismissed. CW-3 has provided assistance to the FBI on numerous investigations since 2018. CW-3 is cooperating in exchange for monetary compensation and immigration benefits. CW-3 has provided information that has been corroborated and that has led to the identification of additional targets of other investigations and seizures of drugs and large amounts of U.S. currency believed to be drug proceeds. Information provided by CW-3 is believed to be reliable.

stolen Rolex and claimed, to CW-3, that the bulk currency was from stolen goods, specifically jewelry.

23.    After the initial payment of cryptocurrency arrived, PAULINO departed the area. Investigators surveilled CW-3 back to the predetermined location.  At the meeting location, CW-3 turned over the black suitcase containing the money.  The money was banded in stacks and wrapped in plastic wraps in bundles of $10,000.  Investigators searched CW-3 for contraband and currency with negative results.  Investigators conducted an official count of the money and determined it to be $439,020 in bulk U.S. currency.  UC-2 then ultimately transmitted $439,020, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO. Based on my experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

*On April 1, 2025, PAULINO Coordinated the*
*Dropoff of $194,115, Believed to be Illegal Proceeds.*

24.  On March 31, 2025, UC-1 received a call from PAULINO, using the 1277 Phone. This call was recorded.  In lightly coded language, PAULINO requested that UC-1 arrange for the pickup of approximately $200,000 the following day, April 1, 2025.  UC-1 confirmed that he would send his runner (CW-3) to pick up the money the next day in Waltham, Massachusetts.

25.  On April 1, 2025, prior to the arranged meeting with PAULINO, investigators met with CW-3 at a predetermined location.  Investigators searched CW-3 and his vehicle for contraband and currency with negative results and equipped CW-3 with an audio/video recording

device.  Investigators then surveilled CW-3 to the meeting location with PAULINO.  Investigators maintained surveillance around the planned meeting location.

26.  On April 1, 2025, at approximately 1:38 p.m., investigators observed PAULINO arrive at the meeting location in a rental vehicle.  PAULINO parked his vehicle near CW-3's vehicle.  PAULINO retrieved a box and three bags from his vehicle and placed those items in the rear seat of CW-3's vehicle.  PAULINO stated that the total amount of money should be $204,000.  CW-3 asked PAULINO about buying a watch on the "cheap," referring to PAULINO's prior statement about the money being the proceeds of the sale of stolen goods.  PAULINO replied that it would not be a problem and that he could get CW-3 whatever he wanted.

27.  PAULINO departed the area.  Investigators surveilled CW-3 back to the predetermined location.  At the meeting location, CW-3 turned over the box and three bags to investigators, which contained the money.  The money was banded in stacks and wrapped in plastic wraps in bundles of various amounts. The box had a written amount of "110,000" and the three bags had the amounts, "27,500", "26,500" and "40,000," written on them.  Investigators searched CW-3 for contraband and currency with negative results.  Investigators conducted an official count of the money and determined it to be $194,115 in bulk U.S. currency.  UC-2 then ultimately transmitted $194,115, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO.  Based on experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

*On April 8, 2025, PAULINO Coordinated the Dropoff of $505,485,*
*Believed to be Illegal Proceeds.*

28.    On April 7, 2025, UC-1 received a call from PAULINO, using the 1277 Phone. This call was recorded.  PAULINO stated that he wanted to conduct a money pick up the following day, April 8, 2025, for approximately $500,000.  UC-1 confirmed that he would send his associate (CW-2) to pick up the money.

29.    On April 8, 2025, prior to the arranged meeting with PAULINO, investigators met with CW-2 at a predetermined location.  Investigators searched CW-2 and his vehicle for contraband and currency with negative results and equipped CW-2 with an audio/video recording device.  Investigators then surveilled CW-2 to the meeting location with PAULINO.  Investigators maintained surveillance around the planned meeting location.

30.    Prior to this meeting, investigators had placed a stationary pole camera outside 132 Ashcroft.  On April 8, 2025, investigators were monitoring the pole camera.  At approximately 3:33 p.m., through pole camera footage, investigators observed PAULINO exit 132 Ashcroft and wheel a large suitcase to a Kia rental vehicle that was parked on the street.  PAULINO placed the large suitcase in the rear of the Kia rental and removed a bag and box from the suitcase.  PAULINO placed the bag and the box in the rear seat.  At 3:37 p.m., PAULINO departed the area of 132 Ashcroft in the Kia rental vehicle.  At approximately 4:02 p.m., investigators observed PAULINO arrive at the meeting location, a Starbucks in Waltham, Massachusetts, in the same rental vehicle.

31.    PAULINO parked his vehicle near CW-2's vehicle.  PAULINO removed four separate packages from his rental vehicle and placed them in CW-2's vehicle.  CW-2 looked in the packages and confirmed that a large amount of currency was present.  PAULINO then departed the area.

13

32. Investigators surveilled CW-2 back to the predetermined location. At the meeting location, CW-2 turned over the packages to investigators, which contained the money. The money was banded in stacks and wrapped in plastic wraps in bundles of various amounts. Investigators searched CW-2 for contraband and currency with negative results. Investigators conducted an official count of the money and determined it to be $505,485 in bulk U.S. currency. UC-2 then ultimately transmitted $505,485, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO. Based on experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

*On April 15, 2025, PAULINO Coordinated the Dropoff of $515,060*
*Believed to be Illegal Proceeds.*

33. On April 14, 2025, UC-1 received a call from PAULINO, using the 1277 Phone. This call was recorded. In lightly coded language, PAULINO stated that he wanted to conduct a money pick up the following day, April 15, 2025, for approximately $200,000. PAULINO then stated that he may have as much as $500,000 for pick up. UC-1 confirmed that he would send his associate (CW-3) to pick up the money.

34. On April 15, 2025, prior to the arranged meeting with PAULINO, investigators met with CW-3 at a predetermined location. Investigators searched CW-3 and his vehicle for contraband and currency with negative results and equipped CW-3 with an audio/video recording device. Investigators then surveilled CW-3 to the meeting location with PAULINO. Investigators maintained surveillance around the planned meeting location.

14

35. On April 15, 2025, at approximately 12:32 p.m., while viewing footage from the pole camera set up in the area of 132 Ashcroft, investigators observed PAULINO approach a White Mazda vehicle approximately four houses down the street from 132 Ashcroft. PAULINO entered the vehicle and then moved it into the driveway of 132 Ashcroft, which is out of the view of the pole camera. At approximately 12:35 p.m., investigators observed PAULINO depart the area of 132 Ashcroft in the Mazda. Investigators were able to confirm that this white Mazda was a rental vehicle. At approximately 12:58 p.m., investigators observed PAULINO arrive at the meeting location in Waltham, Massachusetts in the same rental vehicle.

36. PAULINO parked his vehicle near CW-3's vehicle. PAULINO approached CW-3's vehicle and told CW-3 to move to a different location in the parking lot. CW-3 and PAULINO then both moved their vehicles to the other area of the parking lot. PAULINO then retrieved a package from the passenger area of his vehicle and placed it in CW-3's vehicle. CW-3 confirmed there was a large amount of cash present. PAULINO then departed the area.

37. Investigators surveilled CW-3 back to the predetermined location. At the meeting location, CW-3 turned over the package to investigators, which contained the money. The money was banded in stacks and wrapped in plastic wraps in bundles of various amounts. Investigators searched CW-3 for contraband and currency with negative results. Investigators conducted an official count of the money and determined it to be $515,060 in bulk U.S. currency. UC-2 then ultimately transmitted $515,060, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO. Based on experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

15

*On April 30, 2025, PAULINO Coordinated the Dropoff of $408,150,*
*Believed to be Illegal Proceeds.*

38.  On April 26, 2025, PAULINO, using phone number (646) 244-7925 (the "7925 Phone"), sent a text message to UC-1.  PAULINO informed UC-1 that UC-1 should communicate with him using the 7925 Phone going forward.  On Monday April 28, 2025, UC-1 responded to PAULINO, using the 7925 Phone, "Hola" to acknowledge the change in phone numbers. PAULINO, continuing to use the 7925 Phone, then called UC-1.  This call was recorded.  In lightly coded language, PAULINO stated that he had $400,000 to be picked up and they agreed to meet on April 30, 2025.  UC-1 confirmed that he would send his associate (CW-3) to pick up the money.

39.  On April 30, 2025, UC-1 received a voice memo from PAULINO, using the 7925 Phone.  This voice memo was preserved.  In lightly coded language, PAULINO stated that he had approximately $300,000 available for pickup, but he was trying to get additional money to make it $500,000 for the day's pickup.  UC-1 acknowledged.

40.  On April 30, 2025, prior to the arranged meeting with PAULINO, investigators met with CW-3 at a predetermined location.  Investigators searched CW-3 and his vehicle for contraband and currency with negative results and equipped CW-3 with an audio/video recording device.  Investigators then surveilled CW-3 to the meeting location with PAULINO.  Investigators maintained surveillance around the planned meeting location.

41.  On April 30, 2025, at approximately 12:35 p.m., through the pole camera in the area of 132 Ashcroft, investigators observed PAULINO exit 132 Ashcroft and wheel a large suitcase and a backpack to a vehicle that was parked on the street in front of the house.  PAULINO placed the large suitcase in the trunk of the vehicle and got into the back seat.  Investigators believe the vehicle was a ride-share vehicle.  At approximately 12:59 p.m., investigators observed

16

PAULINO arrive at the meeting location in the ride-share vehicle. He was dropped off and removed the suitcase and backpack from the vehicle.

42. At approximately 1:02 p.m., CW-3 arrived at the meeting location and picked up PAULINO. PAULINO entered CW-3's vehicle with the suitcase and backpack. CW-3 drove around the parking lot with PAULINO. PAULINO pulled another backpack out of the suitcase and handed it to CW-3. PAULINO confirmed the total amount of money as $400,000 with the fee and told CW-3 that he was leaving for Miami after the deal was complete. CW-3 then dropped PAULINO off in front of a store in the parking lot. Shortly thereafter, PAULINO was picked up by another ride-share vehicle and departed the area.

43. Investigators surveilled CW-3 back to the predetermined location. At the meeting location, CW-3 turned over the package to investigators, which contained the money. The money was banded in stacks and wrapped in plastic wraps in bundles of $10,000, $25,000, and $50,000 with the amounts written on each bundle. Investigators searched CW-3 for contraband and currency with negative results. Investigators conducted an official count of the money and determined it to be $408,150 in bulk U.S. currency. UC-2 ultimately transmitted $408,150, minus the broker fee, in TRON cryptocurrency to a cryptocurrency wallet identified by PAULINO. This cryptocurrency wallet was a different wallet than the one provided for the prior transactions described above. Investigators were monitoring the activity in that newly provided wallet. A short time after UC-2 transferred the cryptocurrency to the new wallet, the cryptocurrency was transferred to the original wallet identified by PAULINO. Based on my experience and training, and the manner in which this money drop-off and subsequent cryptocurrency transfer was conducted, investigators believe that this bulk currency was the proceeds of illegal activity and that PAULINO arranged for this money transfer in order to conceal the illegal origin of the money.

17

*On May 9, 2025, PAULINO Attempted to Deliver $877,240 in Suspected Drug Proceeds;*
*Investigators Seized the Suspected Proceeds.*

44.    On May 8, 2025, PAULINO, using the 7925 Phone,[5] exchanged text messages with UC-1 regarding a money pickup.  These messages are preserved.  In lightly coded language, PAULINO stated that he was going to have approximately $800,000 to be picked up.  PAULINO stated that he needed the money picked up soon.  UC-1 stated that they could meet the following day (May 9, 2025).  During this text message exchange, location information for the 7925 Phone showed that the phone appeared to be moving on the train from New York to Massachusetts.  The location information showed that the 7925 Phone was moving along the rail line through Connecticut, Rhode Island, and finally to the Westwood Amtrak station in Massachusetts.

45.    Shortly after the 7925 Phone arrived in the area of the Westwood Station, through pole camera footage, investigators observed PAULINO arrive at 132 Ashcroft.  PAULINO exited what appeared to be a ride-share vehicle holding a red and black bag.  PAULINO then entered 132 Ashcroft.

46.    On May 9, 2025, PAULINO, using the 7925 Phone, continued to exchange text messages with UC-1 and confirmed the meeting time for the money pickup.  Prior to the arranged money pickup, investigators established surveillance in the area of 132 Ashcroft.  Investigators observed a rental vehicle parked across the street from 132 Ashcroft.[6]  At approximately 10:56

---

[5] On May 7, 2025, the Honorable M. Page Kelley issued a warrant for historical and prospective location information for the 7925 Phone.  25-mj-6226-MPK.

[6] As described above, PAULINO frequently used rental cars to deliver the money to the CWs.  Investigators obtained rental information for those vehicles.  PAULINO rented the vehicles under his name, using his Massachusetts driver's license, which listed 132 Ashcroft Street, Dedham, Massachusetts as his address.  On March 13, 2025,

a.m., investigators observed PAULINO exit 132 Ashcroft with a red and black bag and enter the rental vehicle on the street.  Investigators followed PAULINO in the rental towards Route 128/95 North. While on 128/95 North in Dedham, a marked Massachusetts State Police ("MSP") cruiser pulled over PAULINO in the rental vehicle for an unsafe lane change.

47.    During the motor vehicle stop, MSP troopers spoke with PAULINO.  PAULINO's story changed multiple times but admitted that he was transporting a large amount of currency to be structured into small checks through the bank system.  PAULINO lastly stated that the money was from jewelry sales.  During the stop, between speaking with the MSP Trooper, PAULINO sent a text message to UC-1, which stated, "Leave now[.]"  PAULINO further stated that he would call UC-1 later.  Based on experience and training, investigators believe that PAULINO was warning UC-1 to leave the planned meeting location to avoid law enforcement detection.

48.    Investigators found the red and black bag in the vehicle which contained $877,240 in U.S. currency.  The currency was seized.  Prior to submission to evidence, a MSP K9 conducted a random sniff of the bag to include the currency, and the K9 alerted to the presence of narcotics. Based on experience and training, the communications leading up to this planned money drop-off, and the positive K9 alert for the presence of narcotics odor, investigators believe that this currency is drug proceeds.

*PAULINO Communicated with CW-1 about Drug Trafficking and Money Laundering.*

49.    On or about May 15, 2025, while monitoring the location information and call activity for the 7925 Phone, investigators observed that activity ceased on this phone.  Based on

---

PAULINO delivered suspected narcotics proceeds in a rental vehicle and had listed phone number (786) 412-8440 (the "8440 Phone") on the rental agreement.

experience and training, investigators believed that PAULINO had discontinued use, or "dropped," the 7925 Phone.  Based on experience and training, investigators know that it is common for drug traffickers and money launderers to drop their phones after being contacted by law enforcement, as PAULINO was on May 9, 2025, as described above.

50.  On May 19, 2025, PAULINO sent CW-1 a text message from phone number (347) 776-3922 (the "3922 Phone"), and stated that the 3922 Phone was his new phone number, and that CW-1 should pass the phone number on to UC-1.  UC-1 attempted to contact PAULINO several times on the 3922 Phone, but PAULINO did not respond.

51.  On May 23, 2025, at investigators direction, CW-1 made a recorded Facetime call to PAULINO, using the 8440 Phone.[7]  During the call in Spanish, and in lightly coded language, CW-1 asked PAULINO, "if he had any of the other stuff we spoke of?"  PAULINO responded that "he was waiting to meet in person to discuss."  CW-1 explained that UC-1 was "having a problem with the guy who passes [UC-1] the stuff."  PAULINO responded, "Do you need it there or over here?" CW-1 responded, "Boston," and said that he would pay PAULINO, the same way, meaning through cryptocurrency.  PAULINO responded, "Yeah, I understand what you are saying. When we meet up, we can talk more."  CW-1 further reiterated that UC-1 was "looking for the white and Fernando. Good quantities."  Based on experience and training, and a debriefing of CW-1, investigators believe that PAULINO was discussing narcotics, specifically cocaine ("white")

---

[7] CW-1 had previously informed investigators that one of PAULINO's phones was the 8440 Phone.  CW-1 stated that PAULINO used the 8440 Phone for personal matters, but as described below, investigators learned that PAULINO also uses the 8440 Phone as a backup phone to discuss criminal activity.

and fentanyl ("Fernando").  Investigators further believe that PAULINO did not want to discuss the details of a future drug transaction over the phone ("When we meet up, we can talk more.").

*On May 28, 2025, PAULINO Arranged a Meeting with*
*CW-1 to Discuss Narcotics Trafficking.*

52.  On May 28, 2025, at investigators' direction, CW-1 contacted PAULINO, using the 8440 Phone, to arrange an in-person meeting, requested in the May 23, 2025 exchange described above.  PAULINO agreed to meet the following day (May 29) at a restaurant in the Boston area.

53.  On May 29, 2025, prior to the arranged meeting, investigators met with CW-1 at a predetermined location and searched him for contraband and currency with negative results. Investigators equipped CW-1 with an audio/video recording device and surveilled CW-1 to the restaurant.  Investigators maintained surveillance inside and outside the restaurant during this meeting.

54.  Investigators observed PAULINO arrive at the restaurant and go inside.  PAULINO sat down at a table with CW-1.  During this meeting, in lightly coded language, PAULINO explained that the money seized during the May 9 traffic stop was money being laundered for Mexicans.  CW-1 understood this comment to mean that PAULINO was laundering the money for Mexican drug traffickers.  PAULINO stated that he was getting indirect pressure from the money owners (the drug traffickers) to pay the money back and that PAULINO was not allowed to launder any more funds until half of the seized money was paid down to the drug traffickers.  PAULINO stated that he had obtained a lawyer and paid a Jewish man in New York City to falsify jewelry receipts so that PAULINO could submit a claim to have the seized funds returned to him. PAULINO further explained that he would be looking to sell UC-1 cocaine to help him pay the

funds back. PAULINO stated that he did not want to risk traveling with narcotics for fear of being stopped by police and that his plan was to introduce UC-1 directly to PAULINO's drug connections.

*On May 28, 2025, PAULINO Arranged a Meeting*
*with UC-1 to Discuss Narcotics Trafficking.*

55. On May 28, 2025, UC-1 contacted PAULINO, using the 3922 Phone, to arrange an in-person meeting on May 30. PAULINO agreed to meet with UC-1 at a restaurant in the Boston area.

56. On May 30, 2025, prior to meeting with PAULINO, investigators equipped UC-1 with an audio/video recording device. Investigators established surveillance both inside and outside the restaurant prior to the planned meeting. Investigators observed PAULINO arrive at the restaurant and go inside. PAULINO sat down at a table with UC-1. In lightly coded language, PAULINO offered to introduce UC-1 to a Dominican drug supplier in the Boston area who would sell kilograms of cocaine for $13,000 per kilogram. PAULINO stated that he was also attempting to reach out to a fentanyl and methamphetamine supplier, but PAULINO did not yet have prices for these drugs. PAULINO stated that UC-1 would be able to pay for any narcotics through cryptocurrency to the same wallet PAULINO had provided to launder money in the prior money drop-offs. UC-1 explained that UC-1 intended to "start small" with one or two kilograms of narcotics to "test" the product. If the product was high-quality, then UC-1 would order greater bulk quantities. PAULINO stated that would not be a problem. PAULINO indicated that the drug product would be coming from the same Mexican money owners (drug traffickers). PAULINO also offered to introduce a Colombian source of supply for pink cocaine in the Miami area that he knows separately. Based on experience and training and prior communications with PAULINO,

investigators believe that PAULINO was attempting to sell narcotics to UC-1 in an attempt to recoup the money seized on May 9 for his Mexico-based drug suppliers.

57. At the end of the meeting UC-1 complained that PAULINO was not answering the 3922 Phone in a timely manner. PAULINO stated that he does not always check the 3922 Phone. PAULINO then asked UC-1 to communicate with PAULINO on the 8440 Phone if he cannot reach PAULINO on the 3922 Phone. However, PAULINO stated that they would still use the 3922 Phone for "business," which UC-1 understood to mean drug trafficking and money laundering. UC-1 and PAULINO agreed that they would communicate further during the week on June 2 to set up a cocaine transaction.

*PAULINO Continued to Communicate With UC-1 and CW-1 About Future Narcotics Sales and Provided CW-3 with a Free Sample of Suspected Cocaine.*

58. In the days leading up to August 19, 2025, CW-1 and PAULINO exchanged calls and text messages regarding future drug transactions. PAULINO agreed to provide CW-1 with a free sample of cocaine in anticipation of future drug deals on behalf of CW-1. They agreed to meet on August 19, 2025. CW-1 arranged for the drug sample pickup, but as described below, CW-3 actually picked up the drug sample.

59. On August 19, 2025, prior to the arranged meeting with PAULINO, investigators met with CW-3 at a predetermined location. Investigators searched CW-3 and his vehicle for contraband and currency with negative results and equipped CW-3 with an audio/video recording device. Investigators then surveilled CW-3 to the meeting location with PAULINO. Investigators maintained surveillance around the planned meeting location.

60. At approximately 3:30 p.m., investigators observed PAULINO arrive at the planned meeting location. PAULINO then entered CW-3's vehicle. In lightly coded language,

CW-3 asked PAULINO how strong the cocaine was in case CW-3 wanted to cut it. PAULINO stated that he did not know how strong the cocaine was, but that CW-3 should let him know if it was good quality. PAULINO told CW-3 to test the cocaine and let PAULINO know if CW-3 needed more of it. PAULINO then exited CW-3's vehicle and departed the area.

61. Investigators surveilled CW-3 back to the predetermined location. At the meeting location, CW-3 turned over the suspected cocaine to investigators. Investigators searched CW-3 and CW-3's vehicle for contraband and currency with negative results. Investigators conducted a field test of the suspected cocaine, and it returned a positive result for the presence of cocaine. Based on experience and training, the physical appearance of the substance, and the positive field test, investigators believe the substance contains cocaine. The suspected cocaine was sent to the DEA laboratory for testing and the results are pending.

62. During the weeks of November 3 and 10, 2025, UC-1 and CW-1 continued communicating with PAULINO regarding a future cocaine purchase. During these discussions, in lightly coded language, PAULINO stated that he could sell one kilogram of cocaine for $15,500 to be paid through cryptocurrency. PAULINO stated that the deal would have to take place in New York and that PAULINO would put UC-1 in contact with a New York-based drug courier to complete the sale and that PAULINO would provide a cryptocurrency wallet to receive the cryptocurrency payment for the cocaine. As of November 13, 2025, PAULINO informed CW-1 that PAULINO's source of cocaine was not responding to PAULINO's phone calls. PAULINO stated that he owed the IRS $88,000 related to the May money seizure described above and that he feared going to jail for tax evasion. PAULINO stated that he planned to leave the United States and travel to the Dominican Republic to avoid these potential criminal tax charges.

### Conclusion

63. Based on the foregoing, there is probable cause to believe that PAULINO committed the Charged Offense.

Respectfully submitted,

/s/ John A. Bartolomucci
_____

John A. Bartolomucci, Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure

4.1 on November ___14___, 2025.

_____
Hon. M. Page Kelley
United States Magistrate Judge

25